LEONARD H. GARNER AND MIRIAM A. GARNER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Garner v. Commissioner
Docket No. 22992-83.
United States Tax Court
T.C. Memo 1987-510; 1987 Tax Ct. Memo LEXIS 506; 54 T.C.M. (CCH) 824; T.C.M. (RIA) 87510; September 29, 1987; As amended September 30, 1987 *506 Held, Petitioners' acquisition of TV programs was not an activity entered into for profit; held further, petitioners' entitlement to depreciation deductions, investment tax credits, and miscellaneous deductions determined; held further, petitioners are liable for additions to tax pursuant to section 6653(a) and additional interest under section 6621(c); held further, respondent's motion for damages pursuant to section 6673 denied. William R. Kelin, for the petitioners. James W. Clark and Lynn C. Washington, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: On May 6, 1983, respondent issued a statutory notice of deficiency to petitioners [1] for their taxable years 1976, 1977, and 1978, having determined deficiencies of $ 22,181, $ 89,042, and $ 17,709, for each year respectively. At trial respondent filed an Amendment to Answer, asserting the applicability of sections 6653(a) [2] *507 and 6621(d). [3] At that time respondent also filed a motion for damages pursuant to section 6673 which we took curia advisari valt. No concessions were made in this case. The issues for decision are: [4]
(1) Whether petitioners' acquisition of two TV programs was an "activity not entered into for profit" within the meaning of section 183; [5] *508 *509 (2) whether petitioners are entitled to depreciation deductions, investment tax credits, and various other business expense deductions claimed in connection with their TV programs; (3) whether petitioners are liable for the addition to tax pursuant to section 6653(a); (4) whether petitioners are liable for additional interest pursuant to section 6621(c); and (5) whether damages should be awarded pursuant to section 6673. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners resided in New York at the time the petition was filed. Since 1959 Leonard H. Garner (Dr. Garner) has been the President and Chief Executive Officer of Pharmaceutical Food & Drug Associates, Inc., a research organization *510 that tests the toxicity and safety of new pharmaceutical entities for the pharmaceutical industry and the FDA. Dr. Garner obtained a B.A. from New York University in 1943, an M.S. from Booklyn College in 1950, an a Ph.D. in Chemistry from the Universidad Autonoma de Guadalajara, Mexico, in 1958. He began his business in 1948, and claims that it is very successful. Mrs. Garner has been the Corporate Financial and Administrative Secretarial Director of the company since 1952. She attended City College for one year from 1947 to 1948 and did not continue thereafter. In 1976 and 1977 Dr. Garner decided to invest in two television programs. Neither Dr. nor Mrs. Garner has any education, experience or training which would qualify them for management of a television distribution enterprise. Dr. Garner learned about the availability of the investment from Ira Orshan, who had helped him develop an ERISA plan for his company. Mr. Orshan introduced Dr. Garner to Richard Shields of Sheltered Management Corp., (SMC) who was promoting the sale of television programs for Winthrop Industries, Ltd. (Winthrop) and Newport Industries, Ltd. (Newport). [6] Winthrop and Newport had purchased a series *511 of films and programs intending to sell them to different investors. The films were purchased for a small down payment with the balance to be paid from the distribution receipts or in 10 years, and then were resold to investors such as Dr. Garner at a 15-percent profit. Dr. Garner reviewed materials provided by SMC before deciding to invest in the programs, including "Summary of Investments in a Television Program" and "RISK FACTORS," prepared by SMC, and a tax opinion prepared by the law firm Lepatin, Lewis, Green, Kitzes & Blatters, P.C. [7] *512 *513 The investment was described as involving an extremely high degree of risk. The document entitled "RISK FACTORS" contains general statements pertaining to the nature of the investment and the economic risk involved, along with a disclaimer and requirement that the investor seek independent tax advice. The document also addresses to a limited extent the application of the "at-risk" provisions and the investment tax credit provisions. No projections are included. The tax opinion is a 56-page document containing advice for a purchaser of a television program on certain Federal income tax consequences of the purchase including: 1. The PURCHASE Agreement and the validity of the transaction. 2. The DISTRIBUTION Agreement. 3. Basis of the Television Program for Depreciation. *514 4. Method of Depreciation of the Program. 5. Compliance with Tax Reform Act of 1976. (a) Section 465 - AT RISK RULE (as amended) (b) Sections 47 & 48 - INVESTMENT TAX CREDIT (as amended) 6. Sale or other Disposition of the Program. 7. Depreciation, Recapture and Salvage. The Summary of Investments contains general information regarding the terms of purchase of a TV program, the economic profit objective, the tax benefits, and projected income, all relating to a hypothetical purchase of a TV Program. [8]
Dr. Garner discussed the economic merits of the investments with his accountant and attorney, Bernard Resh. With the qualification that he was not an expert in the TV and motion picture industry, Resh reviewed the materials provided and advised Dr. Garner that if the assumptions in the presentation were true, in his judgment Garner would make money. He knew of Joe Lapatin, one of the attorneys who prepared the tax opinion, and respected him. Ira Orshan also attended the initial investment presentation. After reviewing the figures presented he told Dr. Garner that he too thought the investment was a good risk and that Garner "had *515 a good shot at making money and would have some tax benefits." Orshan had no knowledge of the TV industry either. Dr. Garner also discussed the economic merits of making the investment with "associates down at the club who are men with apologies captains in the industry, Fortune 500 company people, that [he] associate[s] with as friends and occasionally business associates."
Here Comes Trouble
On December 11, 1976, Dr. Garner executed an agreement to purchase the program "Here Comes Trouble" from Winthrop. [9] *516 "Here Comes Trouble" is a black and white motion picture starring William Tracy that was made in the 1940's or 1950's and was later edited for television. [10] The program is a comedey-drama involving a newspaper reporter (the hero) who is in love with the publisher's daughter. The reporter is instrumental in solving a murder case and apprehending the murderer after a chase scene that begins on the stage of a burlesque show. The Purchase Agreement provides that the film was in 35 mm gauge and was to be transferred into videotape so that it could be telecast on TV stations. The purchase price provided in the agreement is $ 52,000, with a down payment of $ 10,400. By check dated December 10, 1976, Dr. Garner paid $ 5,200 in escrow to Harry Bigman, an attorney, to be held until closing. The remaining portion of the down payment was paid by check dated December 15, 1976. The purchase agreement provides that a final payment of the balance of $ 41,600 was due in full on or before December 11, 1986. [11] The agreement also provides the following with respect to the remaining balance: (d) The unpaid balance shall bear interest at the rate of six percent (6%) per *517 annum, and such interest shall be paid first from a portion of the income to be derived from the distribution of the TV PROGRAM, any balance remaining at the end of each year, it may be accumulated until the following year(s) until income is obtained from the distribution of the TV PROGRAM and then all of the unpaid interest shall first be paid before any sums may apply to the unpaid principal balance. This AGREEMENT shall not be in default by the fact that interest or unpaid principal due under this AGREEMENT has not been paid prior to the final payment date December 8, 1986. 2. The SELLER agrees that the balance of the $ 41,600 due under this AGREEMENT shall be paid only from the income from distribution of the TV PROGRAM. 3. The PURCHASER agrees that any contract he makes with a Distributor shall contain *518 a provision that he will receive fifty percent (50%) of the gross receipts and that fifty percent (50%) of such receipts or 25% of the gross shall be paid each year to the SELLER to reduce the unpaid balance due under this PURCHASER AGREEMENT. The amounts of monies paid shall first be applied to the unpaid interest, and the balance to the unpaid principal. A statement of the unpaid balance and accrued interest shall be furnished to the PURCHASER by the SELLER at the end of each fiscal period, (which shall be 12 months from the date of this AGREEMENT). Thereafter, a Statement of Account shall be furnished each fiscal year to the PURCHASER indicating payments made during the preceding fiscal year for interest and unpaid principal. Dr. Garner understood that the program had no value if distributed individually, and that it would be distributed to TV stations as part of a package of programs entitled Hal Roach Studios Presents. He signed a letter addressed to Winthrop which provided: Gentlemen: I have just purchased a TV PROGRAM from your Company. I do not wish to distribute this program myself and would appreciate your recommending a TV Distribution Company to me to distribute this *519 program. If you would be good enough to obtain the necessary documents and make the arrangements I would be grateful to you for your assistance.
At the same time he purchased the program he entered into a distribution agreement with Worldwide Trade Exchange, a company owned by Arthur Millman, that distributed feature films, specials, and children's shows to TV stations. [12] The distribution agreement provided that the distributor was to receive 50 percent of the gross receipts received and that all costs incurred in distribution were to be paid by the distributor. [13]
Millman and Shields planned *520 to distribute the Hal Roach package to various TV stations across the country. [14] They prepared a brochure listing the films, and sent the brochure and a personalized letter to TV stations after first calling and describing the package. Millman planned to offer the package using the "barter" system by which TV stations secure programming in exchange for advertising "spots." Distributors of the programs then sell the acquired "spots" to advertising agencies for cash or merchandise and pay the program owner an appropriate percentage of the receipts from the sale. [15] *521 Millman sent his distribution progress reports to SMC. [16] His report to investors in the Hal Roach package for September 1978 indicated that Worldwide Trade had entered into contracts with 17 TV stations nationwide. The following excerpt from the report outlines his total receipts: 2. We obtained from these TV stations TV time, or "spots." No estimate as to the dollar value of these spots can be made at this time since it is contingent upon converting these spots into either cash or in exchange for goods and material. 3. The total amount of TV time previously converted into goods includes: a. Men's clothing with approximate retail value of over $ 90,000.00 last year. b. Tahitian Tan sun tan lotion, 30,000+ bottles. c. Musical tape cartridges, 3,000. d. BIC pens, 10,000 dozen. 4. It is difficult to place an estimated value on the goods set forth in the above paragraph since it is all contingent upon the best prices we can get for them. We are certainly *522 doing our utmost to bring in the most funds since we have a vested interest. We are submitting this interim report to you so that you may be appraised of our activities on your behalf. We shall report back to you shortly before the end of the year with a full report and monies obtained on your behalf. We appreciate your confidence in our organization. Please rest assured that we shall continue to render reports to you from time to time although they may be slightly delayed. It is a well known fact that TV distributors are experts in making money for their clients and equally well known to shun "paperwork". So please bear with us! In fact the letter represents what might have transpired since none of the products received in the barter were delivered in the condition promised and the proceeds expected were not realized. At some point thereafter, dissatisfied with Millman's results, Shields discontinued using his distribution services. [17] *523 Petitioners received a total of $ 103 in 1977 from the distribution of "Here Comes Trouble." [18]
Celebrity Cabaret-12 On June 30, 1977, Dr. Garner executed an agreement with Newport to purchase program 12 of a weekly television entertainment series. [19] *524 The program, part of a series entitled "Celebrity Cabaret," stars Rita Moreno, with Morris Moscovitch and Hanna Aroni as guest performers. The Rita Moreno episode is one of 26 segments of a half-hour variety series. The shows take place in a small room arranged to resemble a nightclub. Richard Hall hosts each episode. He introduces a celebrity who performs his or her specialty and then introduces the unknown talent the celebrity has brought along. In segment 12, after singing a song, Rita Moreno introduces Morris Moscovitch, a comedian who performs a stand-up routine. Hall and Moreno then bring in Hanna Aroni, another singer, who lip syncs a recorded number. The purchase agreement provides that the purchase price was $ 180,000, with an initial down payment of $ 36,000. Dr. Garner paid the down payment by check dated November 1, 1977. The balance, $ 144,000, was to become due and payable ten (10) years from the date of the execution of the agreement. [20] The agreement also provides the following payment terms: (c) The PURCHASER shall have the privilege of prepayment, without penalty, all or part of the $ 144,000 before the due date. (d) The unpaid balance shall bear interest at *525 the rate of simple interest of 6% per annum. This interest shall accrue until the due date. If the PURCHASER shall make any prepayments prior to maturity of the debt, such prepayments shall be first applied to the unpaid interest and the balance applied to reduce the unpaid principal sum. (e) This AGREEMENT shall not be in default by the fact that the interest or unpaid principal due under this AGREEMENT have not been paid prior to maturity. 2. (a) In order to amortize the $ 144,000 obligation due under this AGREEMENT, the PURCHASER agrees that any contract he makes with a Distribution Company, shall contain a provision that the Distribution Company shall receive 50% (or less) of the gross receipts generated from the program distribution. (b) The remaining 50% (or more) of the distribution income shall be due to the PURCHASER. (c) The PURCHASER shall pay 1/2 of the sum realized in 2(b) above, or namely, 25% of the gross receipts, to the SELLER, herein, to reduce the unpaid interest, and to amortize the principal due under this AGREEMENT. (d) Upon the payment of the accrued interest and unpaid principal in full, the PURCHASER shall then retain the full 50% derived from TV distribution *526 for his sole use. (e) The PURCHASER hereby directs the Distribution Company to pay over to the SELLER 25 % of the gross receipts at the same time that he pays to the PURCHASER his 25 % of the gross receipts, without any further instructions, directions, or authorization from the PURCHASER. (f) A Statement of the accrued interest and the unpaid balance shall be furnished to the PURCHASER from the date of this AGREEMENT to the end of the calendar year. Thereafter a Statement of Account shall be furnished for each calendar year indicating payments received and applied to accrued interest and the principal and the balance remaining. Such Statements shall be rendered annually until the accrued interest and principal have been paid in full. On April 1, 1978, Dr. Garner entered in to a distribution agreement with Allworld Telefilm Sales Corp. (Allworld). Gus Nathan, the President of Allworld had been in the television syndication business, television production business, and broadcast business for 35 years. He has held the position of radio and TV salesman, sales manager, station manager, and station owner. Shields had contacted Nathan about distributing the Celebrity Cabaret series. *527 Nathan thought he would have success distributing the series if he produced an additional 26 programs so he could sell the package as a strip of 52 shows. [21] He planned to use the barter system to acquire advertising spots and to promote the series as programming for "prime access time, " week-ends, and late evening (after the news) time periods. At the time he entered into the distribution contract with Garner, Nathan thought the series of 26 programs was not very marketable. He undertook the distribution because he believed he could make money on the distribution of a 52 program strip. There was a need for such programming, in his mind, due to the increase in number of independent stations and cable. Nathan is not certain whether any of the 52 programs were shown by any stations. When he marketed the series, interest in airing the programs was expressed by about 50 percent of the national market, and typically 65 percent of the market is required by advertisers before they will buy *528 spots. He attributed his lack of success in marketing the series to a change in audience interest from variety entertainment shows to "dramatic cops and robber type programs." The only money Nathan paid to Dr. Garner was $ 500 in 1979 as an advance because he was concerned that he might lose Garner as a client. [22]
Miscellaneous Deduction
On Schedule C of their 1976 and 1977 returns and Schedule E of their 1978 return petitioners claimed the following miscellaneous deductions in connection with their TV distribution activity in addition to depreciation and investment tax credits: 1976
1977
1978
(a) travel and entertainment
$ 208
$ 256
$   520
(b) stationery and printing
25
(c) telephone and telegraph
137
260
(d) office in the home
497
(e) management commissions
2,400
(f) mortgage interest
2,400
(g) office expenses
35
$ 233
$ 890
$ 5,615
Respondent disallowed all of the miscellaneous deductions for lack of substantiation and because petitioners' activity was not entered into for profit. OPINION
Value of TV Programs
Petitioners have assigned a fair market value to each TV program equal to its purchase price, or $ 52,000 for "Here Comes Trouble" and $ 180,000 for "Celebrity Cabaret." Offering no *529 expert opinion, petitioners rely on the record to establish that the purchase price accurately reflects fair market value. Respondent claims that the programs should be valued at $ 2,500 and $ 5,000, respectively. These values were arrived at using projected gross receipts for each film which, because of the high risk associated with the investment and the time over which the income was to be produced, respondent claims should be indicative of value. Respondent relied on the expert opinion of A. Frank Reel, an attorney practicing in New York City. From 1954 until 1968 Mr. Reel was employed by ZIV Television Programs, Inc. which in 1960 became United Artists Television, Inc. He served as executive vice-president in charge of business affairs beginning in 1956. ZIV was involved in first-run syndication throughout the 1950's and early 1960's and later when the networks absorbed prime time the company moved into network production. The company sold some of its network programming such as "Bat Masterson," "The Patty Duke Show," "The Fugitive," "Gilligan's Island," and "West Point," in syndication after the conclusion of their network runs. From 1968 until 1977, Reel was connected *530 with Metromedia Producers Corp. He was president from 1970 to 1977. The corporation is a subsidiary of Metromedia, Inc., owners of independent TV stations in New York, Los Angeles, and Washington, D.C., as well as an ABC station in Boston and independent UHF stations in Chicago, Houston, and Dallas. Metromedia, Inc. also owns 14 radio stations. Metromedia Producers Corp. is in the business of producing taped and filmed programming for both network and syndication and is also involved in distributing television programming, including first-run and off-network syndication throughout the United States and Canada. It also operates an international syndication business. During his presidency, Mr. Reel was responsible for both production and sale activities. The Vice President in charge of sales reported directly to him and Reel was required to now the type of programming that would be acceptable in various time segments, the demographic composition of the available audience, and the value of programming for both advertiser and broadcaster. At the time he prepared his Appraisal Reports Reel was associated with a law firm in New York City and specialized in the entertainment field. *531 In this capacity he negotiated and drafted agreements and evaluated properties for clients in the television and distribution business. Mr. Reel is also the author of a book which was published in 1980 and which describes the development of television in the United States and analyzes the economics of production and distribution in the television industry. After viewing both programs, Reel projected gross receipts based on the potential distribution success of each program individually or as part of a package or series. [23] He noted that there are various advertising rates depending on the demographic make-up of the audience, the number of people in the audience, and the hour of the day. Respondent also relied on appraisals of the films prepared by Harvey Reinstein. Reinstein found the films to lack in audience appeal and to have no market value. On the record before us we find that the down payment for each film reflects fair market value. Although petitioners presented no evidence as to value we are not persuaded by respondent's experts in light of the fact that *532 the edited version of "Here Comes Trouble" was not viewed and in addition because we are not convinced that Mr. Reel has sufficient experience distributing films to smaller stations. We found Mr. Nathan to be more helpful in this respect but he offered no opinion as to value. We recognize that respondent also produced the appraisalreport of Mr. Reinstein to support a lower value, but we are not persuaded that his appraisals considered the marketability of the films in a package and have therefore given them no weight.
Issue I
In the statutory notice respondent determined that any deductions not disallowed for specific reasons and any investment tax credit claimed with respect to petitioners' TV programs should be allowed only to the extent provided by section 183(b)(2) because the TV program activity was an activity not engaged in for profit within the meaning of section 183(a). [24] *533 Whether Dr. Garner's TV Program activity was engaged in for profit depends on whether he engaged in the activity with an actual and honest objective of making a profit. Fuchs v. Commissioner,83 T.C. 79, 98 (1984); Dean v. Commissioner,83 T.C. 56, 74 (1984); Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Dr. Garner's expectation of profit need not have been a reasonable one, but he must have entered into the activity, or continued it, with the bona fide objective of making a profit. Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Golanty v. Commissioner,72 T.C. 411, 425-426 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1981). Profit objective is a question of fact to be determined from all of the facts and circumstances. Allen v. Commissioner,72 T.C. 28, 34 (1979); Dunn v. Commissioner,70 T.C. 715, 720 (1978), *534 affd. 615 F.2d 578 (2d Cir. 1980). Respondent's regulations set forth nine relevant factors to be considered in determining whether an activity is engaged in for profit. Sec. 1.183-2(b), Income Tax Regs.[25] *535 In deciding whether the requisite profit objective exists in any case, the presence of one, or even a majority of these factors is not determinative. Golanty v. Commissioner, supra;Benz v. Commissioner,63 T.C. 375 (1974). The burden of proof is on petitioners, Golanty v. Commissioner, supra at 426, with greater weight given to objective facts than to petitioners' mere statement of intent. Siegel v. Commissioner,78 T.C. 659, 699 (1982); Engdahl v. Commissioner, supra;sec. 1.183-2(a), Income Tax Regs. In support of their claim that the TV programs were purchased with the requisite profit motive petitioners offer Dr. Garner's statements of intent, the advice he sought from Resh and Orshan, the efforts of Millman and Nathan in promoting and distributing the tapes, the chance, though small, of making a sizeable profit, and Dr. Garner's alleged payment of the balance of the purchase price of both contracts in 1983. Respondent argues that petitioners' motivation for the purchase of the TV programs was a derivation of tax benefits and not the production of economic profit. Respondent contends that the programs have no value if distributed individually and there was no assurance in the purchase and distribution agreements that the programs would be distributed as part of a package. Furthermore, respondent maintains, Dr. Garner's reliance on the representations of the promoter/seller, failure to view the programs before purchasing them, an lack of concern over the investment are indicative of the lack of profit objective as are the grossly inflated purchase *536 prices, the substantial debt, and the tax benefits involved. Respondent also alleges that petitioners have not proven that they paid off the balance of both contracts in July 1983 as alleged. For the reasons below it is apparent that Dr. Garner lacked the requisite profit motive. Although Dr. Garner reviewed materials which outlined the investment and sought the opinions of Resh and Orshan with respect to the same, none of the three questioned the facts and figures upon which the representations were made and none of the three had any prior knowledge of the TV industry. The materials reviewed did not even address the profit potential and tax consequences of the Hal Roach or "Celebrity Cabaret" series specifically and in fact Dr. Garner never even saw the programs he invested in prior to purchasing them. At best, we have concluded, he reviewed materials relating generally to the investment of TV programs and, convinced, after having Resh and Orshan review the same materials, that the investments were structured properly to meet the requirements for depreciation deductions and investment tax credits and to avoid the consequences of the at-risk provisions, he relied on the representations *537 of Shields about the potential profit from the distribution of the programs. However, Shield's representations were not substantiated. At trial, Dr. Garner and Shields testified as follows: GARNER - DIRECT * * * Q. And basically, how was this film or how were these films to be shown and marketed? A. Well, I was shown a series of schedules. But the one that basically impressed me was a barter arrangement. And if I am to understand this, and I am not an expert in promoting the development and sale of a product, it went something like this. Our distributor would attempt to sign up a major percentage of the market. And if this was achieved, he would sign it up on a barter arrangement. Because in each half hour segment, there are six minutes that are used for commercial viewing. We were to get -- Q. Viewing or advertising? A. Advertising. We were to get three of the six. So that if we sold 65, or 55, or whatever that percentage was of the market, we then could go to an advertising company -- the promoter could not me -- and say I have X number of minutes in Y amount of the market for sale. And they would strike a deal as to the value of those minutes. As it was explained *538 to me, the valuation could be as much of more than $ 10,000 per minute, and we had three of them, which would give us $ 30,000. And if this program were shown three times in the course of a year we had a possibility of $ 90,000 in income. Q. For that year? A. For that year. And the way that they explained it to me, they usually went after a five year deal. Five times $ 90,000 is $ 450,000. They got one half, I got one half. But I split my one half into segments of 25 percent each, a quarter. And one of the segments was used to satisfy the contract. Upon the satisfaction of the document, the rest was mine. It seemed a heck of a way make money. And they also told me that there would be some tax considerations. * * * SHIELDS - DIRECT * * * Q. That means that in return for something you get that advertising time, whoever has that advertising time is entitled to that X number of time on the air to do whatever they want with within a particular time frame? A. Yes. Q. How long is the time frame normally? A. Usually, approximately three years. Q. And basically do you recall the mathematics that you showed Dr. Garner relative to these films which were suggestive of his *539 ability to make a profit, how did you explain it to him? A. I do not think that I understand you question clearly. Q. All right. Basically, did Dr. Garner ever ask you how he could make money from these films? A. Yes. I pointed out to him just like I just explained to you. When we have the television time and it is then sold depending on the number of markets. If we get 60 percent of the markets, these three minutes will be worth $ 10,000 per minute per show. That is $ 30,000 for him alone. Multiply it by three runs, you have $ 90,000. And then if you have cable, if you have video cassettes, and you have the UF and the VHFs, you have a whole big combination of sources where these programs can generate a lot, a lot of income. Q. When you say $ 90,000 the way that you just computed it, that would be the income for one year, right, that would not be the total income? A. No, no, that is for one year. Q. And from your own experience, how many times are these films shown over and over again? A. I can only refer you to the Mary Tyler Moore show that has been shown like a hundred times on television consistently. And counsel, we own the Our Gang comedies. They were made *540 fifty years ago black and white. And every five years the cycle changes, and the stations buy them again, and buy them again, and buy them again. The sample figures are certainly impressive, but they appear to be derived from thin air. Neither witness offered any evidence indicating that the estimated advertising income had any basis in fact, and the figures stated exceed all other projections offered by the other witnesses at trial. [26] Under the circumstances, we think Dr. Garner simply did not take adequate steps to form a reasoned assessment of the investment, and we refuse to allow a businessman of his claimed acumen to rely on his failure to take such steps and on his resulting ignorance. [27] *541 Porreca v. Commissioner,86 T.C. 821, 845 (1986); [28] and compare Lemmen v. Commissioner,77 T.C. 1326 (1981). Consequently, we cannot find that Dr. Garner had a bona fide profit objective when he purchased the TV programs. Petitioners argue that because the television industry is a high risk industry and any investment in a specific TV tape is considered highly speculative their investment is analogous to the examples in respondent's regulations which consider an activity to be entered into for profit if there is a small chance of making a large profit. Sec. 1.183-2 (a) and 1.183-2(c), Example (5), Income Tax Regs. [29] *542 The examples in respondent's regulations appear to be derived from the following comments in the legislative history to section 183: As previously indicated, the committee is in basic agreement with the approach taken by the House to the hobby loss problem. The committee is concerned, however, that requiring a taxpayer to have a "reasonable expectation" of profit may cause losses to be disallowed in situations where an activity is being carried on as a business rather than as a hobby. Accordingly, the committee has modified the House bill to provide that in determining whether losses from an activity are to be allowed, the focus is to be on whether the activity is engaged in for profit rather than whether it is carried on with a reasonable expectation of profit. This will prevent the rule from being applicable to situations where many would consider that it is not reasonable to expect an activity to result in a profit even though the evidence available indicates that the activity actually is engaged in for profit. For example, it might be argued that there was not a "reasonable" *543 expectation of profit in the case of a bona fide inventor or a person who invests in a wildcat oil well. A similar argument might be made in a case of a poor person engaged in what appears to be an inefficient farming operation. The committee does not believe that this provision should apply to these situations or that the House intended it to so apply, if the activity actually is engaged in for profit. [S. Rept. 91-552 (1969), 1969-3 C.B. 423, 489-490.] While the TV industry may be unpredictable, [30] we are not persuaded that petitioners' purchase of these two TV programs is within respondent's regulations. Absent any inquiry into whether it is reasonable to expect the programs to produce a profit, for the reasons discussed earlier the evidence available simply does not convince us that the activity was actually engaged in for profit. Furthermore, none of the evidence before us indicates that under the best of circumstances a profit could have been realized. [31] *545 *546 Thus we cannot infer that petitioners are like the wildcat driller described in the regulations who continues to incur expenses because of a small chance of achieving a sufficiently large return to offset previous losses. *544 [32] See sections 1.183-2(b)(7); 1.183-2(c), Examples (5) and (6), Income Tax Regs. Petitioners also argue that this case should not be considered a "tax shelter" because Dr. Garner paid off the balance of the purchase contracts and that after the pay-off all of the deductions claimed do not exceed the amount contributed to the investment. [33] *547 Thus, petitioners contend, this is a cash investment in which they still have a positive basis which would entitle them to a loss if the investments become worthless, and "The fact that petitioners have not claimed a loss establishes that they believe the investments still have value." Respondent contends that this argument is without merit because petitioners have not proven that the balance was paid off. As proof that the contracts were paid off, petitioners offered a check drafted by Dr. Garner on petitioners' personal checking account, dated July 5, 1983, payable to Reisman Associates, In. in the amount of $ 212,864, and Dr. Garner's testimony that the check represents payment of his contractual obligation. He testified: And I had a little problem at the time. The man that had this situation that I would buy it and normally get it from were on the outs over a stupid matter of a boat transaction. So I went to a third party who knew him and knew me, and asked him to intercede. And I satisfied and paid off the contractual agreement. Incidentally, by doing it, I saved *548 some interest.
Dr. Garner also testified that he decided to pay the balance before the 10-year due date because he had learned from his doctor that he had inoperable heart disease, [34] and, being concerned for the welfare of his wife, he decided to rewrite his will and pay off his debts. On the record before us petitioners have not proven that the contracts were paid off. Petitioners argue that once they introduced the check as the alleged payment respondent must prove the payment was not "real." We disagree. Evidence adduced by a taxpayer, even though uncontradicted, does not necessarily overcome the presumption of correctness attached to the statutory notice or shift to the respondent the burden of going forward with the evidence. See, e.g., Geiger v. Commissioner,440 F.2d 688 (9th Cir. 1971), affg. T.C. Memo. 1969-159. Here petitioners have failed to offer evidence indicating that the balance of the purchase contracts totaled $ 212,864, the amount of the check they produced. From the record it appears that the balance on the contracts after the downpayments were made was $ 175,600. The difference between that amount *549 and the amount paid, or $ 37,264, was never claimed as an interest deduction by petitioners on their 1983 tax return. Furthermore, the only evidence indicating that payment to Reisman Associates, Inc., presumedly a business associate, was in fact satisfaction of the contracts with Winthrop and Newport, the original sellers, is Dr. Garner's vague testimony described earlier and a series of assignments of the right to the balance, if any, on the original purchase contracts at the end of the 10-year period. [35] The parties stipulated the following with respect to those assignments: 63. Attached hereto as Exhibit 64-BL are copies of three assignments related to any liability owed by Leonard H. Garner, as purchaser, to Winthrop Industries Limited, as seller, of the television videotape program "Here Comes Trouble." Petitioner Leonard H. Garner was given the opportunity to purchase such assignment from Winthrop Industries Limited, at the time he executed the agreement whereby he obtained any interest he may have in the program "Here Comes Trouble," for the purchase price of $ 1,000.00. 64. Attached hereto as Exhibit 65-BM are copies of three assignments related *550 to any liability owed by Leonard H. Garner, as purchaser, to New Port Industries Limited, as seller, as a result of executing the agreement whereby Garner acquired any interest he may have in program 12 of "Celebrity Cabaret - East." Leonard H. Garner was offered the opportunity to purchase such assignment from New Port Industries Limited, at the time he executed the agreement whereby he obtained any interest he may have in program 12, for the purchase price of $ 1,500.00.
However, they did not call anyone from Reisman Associates, Inc., nor did they interrogate Mr. Orshan while he was a witness regarding the assignments between Orshan and Reisman and Reisman and Dr. Garner even though Orshan was questioned about the assignments he entered into with Winthrop and Newport. Given the number of unanswered questions about this seemingly circular transaction it was incumbent upon petitioners to bring forth further evidence to show the reality of the payments, and the only inference we can draw from their lack of production is that further testimony would conflict with Dr. Garner's. See Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947). *551 Furthermore, it is inconceivable that petitioners would pay over $ 200,000 to Orshan or Reisman when Orshan only paid $ 2,500 for the assignments and when Dr. Garner could have purchased the same assignments for $ 2,500 when he bought the TV programs. This lack of further testimony may suggest as the likely scenario that Dr. Garner may have arranged for his advisor, Orshan, to hold the assignments for him in order to avoid invalidation of his notes by his purchase of them. We doubt that Dr. Garner ever expected, or intended, to be called upon to pay the balance of the notes, and we cannot find, on the basis of this record, that he paid the same. On these facts petitioners have not established that their activity was entered into for profit and therefore they are limited to deductions allowed under section 183.
Issue 2
In connection with the purchase of the TV programs, petitioners claimed depreciation deductions, investment tax credits and miscellaneous business deductions. Because Dr. Garner's activity was not entered into for profit, petitioners are not entitled to an investment tax credit or to depreciation and other deductions except to the extent permitted by section 183(b). *552 Flowers v. Commissioner,80 T.C. 914, 931 (1983); Pike v. Commissioner,78 T.C. 822, 841 (1982), affd. without published opinion 732 F.2d 164 (9th Cir. 1984). Since petitioners failed to substantiate any of their miscellaneous deductions, the only permissible deduction to offset income under section 183(b)(2) is depreciation. In determining the allowable depreciation, respondent maintains that petitioners' use of sliding scale method of depreciation is improper and that petitioners' basis in the TV programs should be limited to fair market value. Respondent contends that the depreciation method chosen by petitioners does not clearly reflect income and that under the authority of section 446 respondent has determined that the income forecast method most accurately reflects income. [36]
Petitioners derived the sliding scale method of depreciation from KIRO, Inc., v. Commissioner,51 T.C. 155 (1968). *553 Using this method, petitioners claimed a depreciation expense deduction of 60 percent of the cost of the films in the first year, 15 percent in the second year and 5 percent in the third year ("Here Comes Trouble" only), and were to claim 5 percent in each succeeding year. petitioners assigned a 10 year useful life to each film. [37]
KIRO, Inc. involved a TV station that had acquired programing rights of various TV programs and films. In order to determine whether the station calculated a reasonable allowance for depreciation we divided the programs into three categories: those the subject of a contract which permitted the station to broadcast each program up to seven times over a 10-year period; those under contracts which permitted the station to make a limited number of broadcasts depending on the terms of contract; and those which were the subject of contracts permitting the station to telecast each program an unlimited number of times over periods ranging from 12 to 48 months. We held that the station was entitled to use the sliding scale method of depreciation for the first *554 two categories, but not the third. We determined on the basis of the record before us, that generally an earlier run of a film, and particularly the first run, has greatest audience appeal and normally generates the most revenue. In the first two circumstances, the taxpayer provided sufficient evidence to support the percentage of depreciation attributed to each showing. Yet in the third category there was no basis for allowing the taxpayer's schedule of depreciation. We agree with respondent that petitioners have not proven that the sliding scale method is applicable in this case. Fundamental to our decision in KIRO, Inc. was the evidence that the method of depreciation chosen was based on the "facts of life" of the television industry and the contracts limiting broadcasts of the programs. In this case there is no evidence that indicates that the number of broadcasts was finite [38] and although we might agree that certain programs bring greater advertising revenues for earlier runs, we have no evidence of record to support such a finding in this case and we have no other evidence which supports the schedule petitioners have chosen. See Computing & Software, Inc. v. Commissioner,64 T.C. 223, 238 *555 (19750; Tribune Publishing Co. v. Commissioner,52 T.C. 717, 724-725 (1969), affd. 451 F.2d 600 (9th Cir. 1971); KIRO, Inc. v. Commissioner, supra. Petitioners have not claimed any other allowable method of depreciation and have failed to demonstrate error in respondent's determination that the proper method for depreciating the programs was the income forecast method.[39] *557 Accordingly, we sustain respondent's determination as to the method of depreciation. [40] Under the income forecast method, petitioners are not entitled to depreciation deductions in years in which no income is received. Abramson v. Commissioner,86 T.C. 360, 377 (1986). Further, where insufficient evidence is produced to forecast estimated income, no depreciation is allowable. In this case the only projections were made by Millman and Reel, both of whom were respondent's witnesses. [41] Petitioners presented no evidence as to projected income. On the basis of the record before us we are not persuaded that either Millman's or Reel's estimate is accurate. Judging from the results of his *556 distribution efforts, we are not convinced Millman had the experience necessary to make such projections, and Reel, although knowledgeable about certain aspects of TV programming, does not appear to have fully considered the market for these programs in smaller stations. Although insufficient evidence as to projected income would be cause for us to disallow any deduction whatsoever (see Abramson v. Commissioner, supra at 378), we view respondent's acceptance on brief of the projected income as a concession that petitioners are entitled to a deduction in the amount determined on the basis of those projections, and therefore will allow a deduction for depreciation in 1977 in the amount of $ 69.[42]
Respondent also maintains that for purposes of depreciation petitioners' basis in the programs should be limited to fair market value. Respondent reaches this conclusion by arguing that the agreements to pay the balance of the purchase price are in substance nonrecourse and should not be treated as true debt because the purchase price of the programs unreasonably exceeds fair market value. See Waddell v. Commissioner,86 T.C. 848, 901 (1986); Estate of Franklin v. Commissioner,64 T.C. 752, 771 (1975), affd. 544 F.2d 1045 (9th Cir. 1976). Without reaching the issue of whether the debt in this case is in substance nonrecourse, we conclude that the basis of each film is its fair market value. Generally, under section 1012, basis is limited to the price paid. However *558 this rule does not apply where a transaction is based on peculiar circumstances which influence the purchaser to agree to a price in excess of its fair market value. See Lemmen v. Commissioner,77 T.C. 1326, 1348 (1981); Bixby v. Commissioner,58 T.C. 757, 776 (1972). In this case it is clear that the purchase price was grossly in excess of the fair market value of the films and that there was no business purpose for the same. See, e.g., Taube v. Commissioner,88 T.C. 464, 487 (1987). Under these circumstances we have disregarded the agreements to pay the balance of the purchase price for tax purposes and decline to include the liability in petitioners' basis.
Issue 3
Because the addition to tax pursuant to section 6653(a) was raised by respondent in the Amendment to Answer, respondent bears the burden of proving that all or a part of the understatements of income tax for each of the years in issue is due to negligence or intentional disregard of the rules and regulations. Rule 142(a). Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner,85 T.C. 934, 947 (1985). On the record before *559 us respondent has shown that petitioners' understatements are due to negligence. We find significant the fact that petitioners entered into this investment without making an adequate investigation into the figures represented by the promoter. Furthermore, once the programs were purchased, petitioners failed to keep any books or records relating to the distribution of their TV program. In addition, when their miscellaneous business expenses were challenged, petitioners produced no evidence to refute respondent's determinations, leading us to the conclusion that none existed. Based on the record as a whole, respondent's determination is sustained.
Issue 4
Respondent also asserted the applicability of section 6621(d), redesignated section 6621(c), in the Amendment to Answer and he bears the burden of proof on that issue. Rule 142(a). Zirker v. Commissioner,87 T.C. 970 (1986). Section 6621(c) provides for an interest rate of 120 percent of the adjusted rate established in section 6621(b) where there is a "substantial underpayment" (an underpayment of at least $ 1,000) in any taxable year "attributable to 1 or more tax motivated transactions * * *." This section applies to interest *560 accruing after December 31, 1984, even though the transaction was entered into prior to its date of enactment. Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). Section 6621(c)(3)(A)(i) includes within the definition of tax-motivated transactions any valuation overstatement within the meaning of section 6659(c). Under regulations issued by respondent pursuant to express authority of section 6621(c)(3)(B), the definition of tax-motivated transaction also includes any deduction disallowed for any period under section 183, relating to an activity engaged in by an individual that is not for profit. Sec. 301.6621-2T, Q and A-4, Proced. & Admin. Regs. (Temporary) 49 Fed. Reg. 50391 (Dec. 28, 1984). All of the deductions disallowed relate to petitioners' TV distribution activity, which we held was an activity not entered into for profit under section 183. Thus section 6621(c) applies with respect to the underpayments attributable to those deductions. Section 6621(c) also applies to the underpayments attributable to the investment tax credits resulting from petitioners' claim of basis in excess of fair market value. *561 Petitioners' inflated basis for each film is a valuation overstatement within section 6659(c), and therefore a tax motivated transaction within section 6621(c). [43]
Issue 5
Finally, in the motion for damages pursuant to section 6673, respondent claims that the positions asserted and maintained by petitioners are frivolous and that petitioners commenced and maintained this proceeding primarily for the purpose of delay "as demonstrated by their frivolous motions, and failure to comply with the Tax Court's Rules of Practice and Procedure, the orders of this Division of the Court, and to properly prepare this case for trial." We have considered the record as a whole and find that petitioners' conduct in this case does not warrant the imposition of damages provided for in section 6673. Respondent's motion will therefore be denied. Decision will be entered under Rule 155.
APPENDIX A Summary of Investments
I. THIS PROGRAM IS AN INVESTMENT FOR ONE INDIVIDUAL (Not a Limited Partnership):
A. Investor will purchase a television program with rights to telecast on U.S. television, in perpetuity. *562 The Purchase Agreement will set forth all of the terms including down payment and the balance due. NO NOTES ARE SIGNED. THIS IS NOT A LIMITED PARTNERSHIP, AND NO PARTNERS ARE INVOLVED. NO UNITS ARE SOLD. THE INVESTOR IS THE SOLE OWNER OF THE PROGRAM. B. The Television program is priced at $ 60,000. The Investor makes a down payment of $ 12,000 and is "at risk" and owes a balance of $ 48,000 due 10 years from the date of purchase. He has the option to prepay any or all of this amount during this 10 year period, without penalty. C. Investor contracts with a television distributor to license the program on TV stations. The usual Distribution Agreement is for the Distributor to receive 50% of the gross receipts (paying his own travel costs, printing, sales costs, promotional material, video tapes and other incidental expenses); and the remaining 50% of such receipts is paid to the Investor. D. Investor may decide to prepay the $ 48,000 obligation before 10 year period by providing that from his share 25% of the gross receipts is to be paid to the Seller to amortize the debt, and the remaining 25% of the gross profits to be retained by himself as his profits. E. At the expiration *563 of the ten years, if the debt has not been paid in full, the Investor shall pay the balance due. He may obtain such funds from his own account, borrow the money from a lending institution, or from an individual whom we could recommend who would lend the Investor the money.
II. ECONOMIC PROFIT:
The Investor purchased a television program and entered into an Agreement with a Television Distributor to license this Program to TV Stations in order to make a profit. This Program will be exploited during the next ten years on all television stations in the United States. It is projected and contemplated that the balance due on the purchase price will be paid in full, and that a profit will be earned by the Investor over the ten year period.
III. TAX BENEFIT INCIDENTAL TO THE INVESTMENT:
A. The investment of $ 60,000 in a television program will permit a 60% depreciation (write-off); namely $ 36,000 the first year: 10% the second year, and the balance spread over the remaining eight years. This is considered a five to one (5:1) leverage. B. Investor may also take a full 10% Investment Tax Credit the first year. On a $ 60,000 investment, the deduction is $ 6,000. After you compute *564 your taxes, you may reduce your taxes by $ 6,000. C. The above depreciation and investment tax credit is in compliance with Section 465 (the "at risk" provision) and Section 804 (investment tax credit provision) of the Tax Reform Act of 1976.
IV. PROJECTIONS OF DISTRIBUTION OF "ONE" TELEVISION PROGRAM:
A. Television Stations do not purchase one television program. Programs are usually 26 in a group so that they can be telecast one a week for 26 weeks. The Distributor will take this one program and depending on its content, such as drama, mystery or comedy, incorporate it with 25 others to make up a program of 26. Any income will be shared equally, each program owner will receive 1/26th of the gross receipts. The Distributor will receive 50% and the Investor 50%. There is no relationship among the program owners. The Distributor must market the product, and it rests with his organization how to group the programs. These programs are obtained by the Distributor from a variety of sources. B. The Distributor has a following among advertising agencies who advise him on what TV Stations their clients wish to advertise their products. The Agency purchases TV time, known in the *565 industry as "spots". Each spot is 30 seconds. C. The Distributor and his Staff visit these stations, offer the Dramas, Mysteries or Comedies, without any cash outlay by the TV Station. He receives TV time (spots). The spots are then sold to the Agency at a discount from the prices listed in Standard Rate & Data. The cash realized is then distributed; 50% to the Distributor and 50% to the Investor, or owner of the Program. D. The TV Station obtained these programs without any cash payments. The Agency performs a service to its clients by obtaining discounted rates, and the Distributor in this manner receives immediate cash for his Company and the Investor.
V. PROJECTED INCOME FOR THE FIRST RUN - INITIAL DISTRIBUTION
ONE TELEVISION PROGRAM
CASH
50%
50%
SPOTS
REALIZED
DISTRIBUTOR
INVESTOR
One Station
100
$   3,000
$  1,500
$  1,500
Five Stations
500
15,000
7,500
7,500
Ten Stations
1,000
30,000
15,000
15,000
Fifty Stations
5,000
150,000
75,000
75,000
Sixty-Six Stations
6,600
198,000
99,000
* *566 99,000 VI. TAX INVESTMENT SAVINGS COMPUTED FOR A MARRIED TAXPAYER FILING A JOINT RETURN
TELEVISION PROGRAMS
(1)
(2)
(3)
(4)
(5)
TAXABLE INCOME
$ 60,000 $ 120,000
$ 180,000
$ 240,000
$ 300,000
60% DEPRECIATION 1st YEAR
36,000 72,000
108,000
144,000
180,000
ADJUSTED TAXABLE INCOME
24,000 48,000
72,000
96,000
120,000
THE TAX IS
5,660 16,060
28,820
42,780
57,580
DEDUCT INVESTMENT CREDIT
6,000 12,000
18,000
24,000
30,000
NET TAX TO PAY
$   (340)
4,060
10,820
18,780
27,580
TAX DUE BEFORE INVESTMENT
22,300 57,580
97,180
138,980
180,980
SAVINGS AFTER INVESTMENT
22,640 53,520
86,360
120,200
153,400
CASH OUTLAY FOR PROGRAM
12,000 24,000
36,000
48,000
60,000
NET NET SAVINGS
10,640 29,520
50,360
72,200
93,400
PLUS SAVINGS ON YOUR STATE INCOME TAX
VII. INVESTOR: MAKE YOUR OWN ANALYSIS OF THE TAX YOU WILL PAY IN 1977 1976
1977
Adjusted Gross Income:
Less Deductions:
-
-
NET
$
$
Less exemptions:
-
-
Taxable Income
TAX TO BE PAID:
$
$
Don't you think that you should consider this investment? Consult the above Tax Savings chart and see how much money you can save in taxes.
* * *
IX. THIS INVESTMENT INVOLVES A HIGH DEGREE OF RISK AND IS SUITABLE ONLY FOR PERSONS OF SUBSTANTIAL MEANS AND WHO CAN *567 AFFORD THE LOSS OF THEIR ENTIRE INVESTMENT. EACH INVESTOR SHOULD CONSULT HIS OWN COUNSEL, ACCOUNTANTS, AND OTHER PROFESSIONAL ADVISORS AS TO LEGAL, TAX, ACCOUNTING, AND RELATED MATTERS CONCERNING THIS INVESTMENT. THIS INVESTMENT IS AVAILABLE ONLY TO THOSE INVESTORS WHO WOULD BE SUBJECT TO FEDERAL INCOME TAX AT THE RATE OF 50% OR HIGHER. Footnotes
1. Petitioner Miriam A. Garner is a party to this case because she filed jointly with Leonard H. Garner. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. 3. Section 6621(d) was redesignated section 6621(c) by Pub. L. 99-514, sec. 1511(c)(1)(A)-(C), 100 Stat. 2744. ↩
4. The bar of the statute of limitations was also raised in the petition. At the hearing on preliminary matters the Court ruled that the issue would not be tried since petitioners conceded that they executed extensions of time to assess tax. The Court informed petitioners that if they wanted to preserve for appeal the issue of the validity of the extensions they should raise the same in a pleading that could be ruled on at trial. Petitioners did not pursue the argument at trial or on brief. ↩
5. We note that on brief respondent alleges that "The entire series of transactions underlying petitioners' alleged television program distribution business are sham and without economic substance and therefore, petitioners were engaged in no trade or business or activity for the production of income." In the alternative respondent claims that "Even if there were substance to the transactions involved in this case, the petitioners' investments in the television programs were made without a bona fide expectation of profit and, therefore, petitioners are entitled to deductions only to the extent allowed under IRC § 183." Nowhere in the statutory notice or trial memorandum did respondent allege that the entire transaction in this case should be disregarded under the sham transaction theory. The statutory notice makes reference only to section 183, except under the specific reasons for disallowing depreciation: b. Alternatively, it is determined that the portion of the depreciation deduction attributable to the amount of the following unpaid contract balances is disallowed because said contracts lack economic substance, and therefore, cannot be added to the cost or depreciable basis of the property: T.V. Video Tapes
Unpaid Contract Balance
"Here Comes Trouble"
$  41,600
"Celebrity Cabaret"
144,000
[Emphasis added.] In the trial memorandum respondent asserted that the basis of the programs was zero becuase "Any purchase by petitioners of television programming was primarily for * * * tax avoidance and does not represent a bona fide, arms length transaction." In light of the untimeliness of respondent's sham transaction argument we are forced to base our analysis on the presence of a profit objective under section 183↩ and the regulations thereof, and have limited our discussion of economic substance to whether the unpaid contract balances should be included in basis. 6. Although apparently Mr. Shields did not hold an ownership interest in either Winthrop or Newport, he and an accountant named Irving Satty were involved in the plan to purchase and resell the programs. Shields was the person who "was knowledgable in the TV industry." He and Satty were to receive commissions from the sale of programs to investors. ↩
7. Dr. Garner did not recall exactly what materials he reviewed, other than a document that explained the investment and the tax benefits he would receive. Because the parties stipulated to the admissibility of a letter signed by Dr. Garner which indicated he reviewed a document entitled "RISK FACTORS," and also stipulated to the admissibility of a separate document entitled "RISK FACTORS," which was not executed, but which was dated December 11, 1976, we assume this is a copy of one of the documents Dr. Garner reviewed. In addition, Bernard Resh, Dr. Garner's attorney an accountant, testified that the presentation, at which he was present, included a tax opinion prepared by Joe Lepatin. We note, however, that the stipulated copy of the tax opinion is dated April 15, 1977, which is subsequent to the date Dr. Garner first purchased a TV program. Various other documents were also listed in the parties' stipulation including "Tax Shelter Summary," "How to Evaluate a TV Program," "Television Distribution and Marketing Principles in the Television Industry," "TV Program Evaluation," and "How is the Fair Market Value of Property Determined for Federal Income Tax Purposes." According to the stipulation, these documents were not offered for the truth of the matters contained therein, and in the event they were, respondent objected on various grounds including hearsay, materiality, relevancy, competency, authenticity, and best evidence. The documents were admitted into evidence at trial subject to respondent's objections. Neither party addressed them after that. We are without any indication as to the purpose of these documents since Dr. Garner cannot recall what he reviewed and no other witnesses testified as to their knowledge of them or of what was included in the presentation by SMC. Consequently other than in this footnote, we have not included these documents or reference to them in our findings. 8. See Appendix A for a copy of this document. ↩
9. At trial there was some confusion as to which of two contracts presented was the actual purchase contract. From the testimony it appears that the agreement identified as Joint Exhibit 14-N is the final version of the contract. Dr. Garner does not recall which contract he signed. 10. Although Dr. Garner an Mr. Shields thought the tape purchased was edited for a 30-minute program, no such tape was produced for trial. Respondent's expert, Mr. Reel, testified that he viewed a 70-minute film, but his report refers to a one-hour videotape. He was unaware that a 30-minute program existed. The only tape produced for trial is that which was reviewed by respondent's experts which in fact ran 50-55 minutes. ↩
11. The right to the balance, if any, due at the end of the 10-year period was assigned to Ira Orshan by Winthrop in a separate agreement dated December 15, 1976. Orshan paid Winthrop $ 1,000 for the assignment. On July 1, 1983, Orshan assigned the same right to Reisman Associates and on July 6, 1983, Reisman Associates assigned the right to the balance due to Dr. Garner. ↩
12. We note that the distribution agreement was executed by Dr. Garner only. Dr. Garner did not deal directly with Mr. Millman. Instead, he communicated with Mr. Shields who negotiated with Mr. Millman. ↩
13. The agreement also provided that the distributor was to maintain at his office an accurate and complete set of books of record containing all information relating to the distribution of the TV PROGRAM, showing gross receipts, contracts with television stations, agencies or clients, and amounts of monies received, collected and balances due. No such books of record were produced for trial. ↩
14. Although the Garner distribution agreement did not require distribution in a package, Millman's company had entered into similar distribution agreements with the other owners of the various films in the package. ↩
15. Millman projected that each program would generate $ 150 per station that entered into a barter agreement. He based his projection on anticipated receipt of three "spots" per program which he could sell to advertisers for an average of $ 25 each. He also counted on each program being run twice. He projected that 60 stations would be interested due to a "nostalgia craze," thus the total income anticipated per program was $ 9,000. His projection was based on an average, since advertisers pay different amounts to stations depending on the potential viewing audience. 16. He does not know whether his letters were sent to investors. ↩
17. Shields claims that he contacted Gus Nathan to continue the distribution efforts, but Nathan testified that he was not involved in the distribution of the Hal Roach package. From the record we can only conclude that no one continued trying to distribute the package. 18. Petitioners reported $ 4,800 as income from their TV distribution activity in 1978 but did not designate to which film the income is attributable. No evidence was offered indicating the source of the income.↩
19. Dr. Garner recalled entering into the agreement in November although the document is dated June. 20. The right to the balance due, if any, at the end of the 10-year period was purportedly assigned to Ira Orshan on October 25, 1977. The document effecting the assignment refers to a Purchase Agreement dated October 25, 1977, while the Purchase Agreement before us is dated June 30, 1977. The assignment also begins by naming Newport as the Assignor, but later directs "Lenox Industries" to assign its rights to Garner's payments. We have no explanation for ths discrepancy. On July 1, 1983, Orshan assigned the right to the balance to Reisman Associates. On July 6, 1983, Reisman assigned the right to Dr. Garner. ↩
21. Shields sent Nathan a brochure to use to market the original 26 programs but it appears from the record that Nathan did not begin marketing Celebrity Cabaret until he had 52 shows to distribute. ↩
22. See n. 18.↩
23. He viewed a 50-55 minute version of "Here Comes Trouble," rather than a 30 minute TV version. See n. 10, supra.↩
24. Section 183 permits limited deductions for activities not engaged in for profit. See Waddell v. Commissioner,86 T.C. 848, 890-891 (1986); Brannen v. Commissioner,78 T.C. 471, 499-500 (1982), affd. 722 F.2d 695 (11th Cir. 1984). An "Activity not engaged in for profit" is "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Sec. 183(c). We would have preferred to analyze this case on the basis of the "unified approach" of Rose v. Commissioner,88 T.C. 386, 414 (1987), rather than on a section 183↩ analysis. 25. These factors are (1) the manner in which the taxpayer carries on an activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity, (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. 26. Shields made reference to a book which provides information on each television station and advertising rates paid for certain times on those stations, but gave no indication as to how he arrived at his figures using the manual. ↩
27. See Carlson v. Commissioner,T.C. Memo. 1987-306. 28. See Burpee v. Commissioner,T.C. Memo. 1983-710↩. 29. Example (5). A, an independent oil and gas operator, frequently engages in the activity of searching for oil on undeveloped and unexplored land which is not near proven fields. He does so in a manner substantially similar to that of others who engage in the same activity. The chances, based on the experience of A and others who engaged in this activity, are strong that A will not find a commercially profitable oil deposit when he drills on land not established geologically to be proven oil bearing land. However, on the rare occasions that these activities do result in discovering a well, the operator generally realizes a very large return from such activity. Thus, there is a small chance that A will make a large profit from his oil exploration activity. Under these circumstances, A is engaged in the activity of oil drilling for profit. 30. See Porreca v. Commissioner,86 T.C. 821, 846 (1986); Bizub v. Commissioner,T.C. Memo. 1983-280↩. 31. See Porreca v. Commissioner, supra.
We have disregarded the figures posited by Dr. Garner and Shields because we have no indication that they have any basis in fact. See discussion, pages 24-27, supra. Furthermore, we have not relied on the projections in the investment materials because we have no indication that they relate to these specific programs and nothing in the investment materials indicates that the figures are representative of what might be expected from the sale of advertising in general in the market for which these programs are suitable. The only other projections offered were those by Millman, the distributor of "Here Comes Trouble," Reel, respondent's expert, and Reinstein, respondent's other expert. We have not given Reinstein's appraisals any weight because he evaluated the programs based on distribution as single programs rather than as part of a package or series. Millman projected that "Here Comes Trouble" would gross $ 9,000 of which one-half, or $ 4,500 was to be paid to petitioners. Under the terms of the purchase agreement, one-half of that amount was to be used to pay the purchase price. Reel projected between $ 10,000 and $ 15,000 in gross receipts for "Here Comes Trouble." However, we note that he did not view a version which was edited for TV. Nonetheless, petitioners' share in Reel's view would be between $ 5,000 and $ 7,500. Petitioners' down payment for the program was $ 10,400. Thus, even without the deductions taken for depreciation and various other expenses, petitioners would not have realized a profit over their out-of-pocket expenses. Similarly, the only projection of gross receipts for the Rita Moreno program is that by Reel of $ 20,000- $ 25,000. Notwithstanding his opinion that residual and distribution fees would absorb all of the receipts, since nothing in the purchase contract made petitioners liable for the residuals, petitioners' share would be between $ 10,000 and $ 12,500. The down payment for the program was $ 36,000. Again, even without the claimed losses from depreciation deductions, investment tax credit and various other deductions, petitioners would not have realized a profit. Because potential receipts would not exceed out-of-pocket expenses, we do not even need to add to our discussion a comparison of the tax benefits. See. e.g., Estate of Baron v. Commissioner,83 T.C. 542 (1984), affd. 798 F.2d 65↩ (2d Cir. 1986). 32. Compare Hezel v. Commissioner,T.C. Memo. 1985-10, in which we noted that the examples in the regulations illustrate for profit activities not only because of the possibility of a large return in the investment but also because of the circumstances of that particular business. See also Outten v. Commissioner,T.C. Memo. 1984-81, affd. 752 F.2d 648↩ (11th Cir. 1985). 33. Petitioners apparently believe that payment in 1983 vitiates the fact that they claimed deductions in the years 1976-1978. "Tax shelters," are, by their nature, arrangements designed to defer income tax consequences, i.e., deductions available in early years are offset by additional income from profits in later year. See, e.g., Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 197 (1983), affd. in part and reversed in part 752 F.2d 89↩ (4th Cir. 1985). 34. Dr. Garner produced records to evidence his medical problem. ↩
35. See n. 11 and n. 20, supra.↩
36. On brief respondent asserted: Because the partnerships failed to elect either of the methods allowable in this case, income forecast or straight line, the respondent may place it on an allowable method of depreciation. I.R.C. sec. 446. [Emphasis added.]
There were no partnerships involved in this case. ↩
37. Using this schedule of depreciation, 100 percent of the purchase price would be recovered in 8 years. ↩
38. Although there was testimony that the shows were expected to be run 2 to 3 times, this does not support the schedule adopted. ↩
39. Depreciation is calculated under the income forecast method by multiplying the basis of the depreciable asset by a fraction, the numerator of which is the income from the asset for the taxable year and the denominator of which is the estimated total income from the asset during its useful life. Income means net, rather than gross, income. Durkin v. Commissioner,87 T.C. 1329, 1373-1374 (1986); Abramson v. Commissioner,86 T.C. 360, 377 (1986). The method is intended to match income and depreciation deductions. Abramson v. Commissioner, supra.↩
40. See Schwartz v. Commissioner,T.C. Memo. 1987-381↩, slip op. at 44. 41. As we stated earlier, we disregarded Reinstein's appraisals. ↩
42. Respondent arrived at this amount using Reel's projections (103/3750 x $ 2,500). Without evidence indicating to which film the $ 4,800 reported in 1978 is attributable we cannot ascertain the allowable depreciation in that year. ↩
43. See, e.g., Helba v. Commissioner,87 T.C. 983, 1015 (1986); Leger v. Commissioner,T.C. Memo. 1987-146↩.
*. The Investor owwes the Seller $ 48,000. He pays off this debt and realizes a profit of $ 51,000. These projections are only for the FIRST run. They do not take into consideration that there are over 1,000 sources of telecasting, nor re-runs or renewals of licenses after the initial period expires.